UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                                        Case No.: 17-20770

v.                                   Honorable Gershwin A. Drain

KEWAI TYRONE HUNTER,

        Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS [#27]

### I. INTRODUCTION

On November 14, 2017, the grand jury returned an Indictment against Defendant charging him with possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1), possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1), possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c), and felon in possession of a firearm in violation of 18 U.S.C. § 922(g).

Presently before the Court is the Defendant's Motion to Suppress Evidence, filed on July 30, 2018. The Government filed its Response in Opposition on August 15, 2018. A hearing was held on September 27, 2018, and on October 1,

2018.  At the hearing, Washtenaw County Sheriff Deputies Jeff Hankamp and Jessie Smith testified.  Additionally, the Court reviewed video from both officers' body cameras, as well as video from their patrol cars.  The parties submitted supplemental briefing subsequent to the hearing.  For the reasons that follow, the Court will deny the Defendant's Motion to Suppress Evidence.

## II.     FACTUAL BACKGROUND

Around 2:00 a.m. on July 19, 2017, Deputy Jeff Hankamp of the Washtenaw County Sheriff's Office was dispatched to 1595 Stephens near Pine Court in Ypsilanti, Michigan, on a felonious assault call.  The caller, Ryan Hughes, advised that Kewai Hunter, a black male wearing a grey tank top and jeans, had approached him, lifted his shirt, and threatened him by displaying a black handgun tucked into his waistband.

Deputy Hankamp responded to the Stephens address and met with Ryan Hughes.  Hughes advised that his sister had a child with Hunter and that Hunter had physically abused his sister in the past.  He further explained that Hunter continued to come over to the house, where Hughes lived with his mother, to cause trouble.  Hughes's mother yelled to Hankamp from the porch that Hunter was on parole and provided his date of birth.

Hughes further advised that on July 18, 2017, Hunter had pointed a handgun at him, which was the same handgun he had just threatened Hughes with by lifting

up his shirt to reveal its location in his waistband. Hughes indicated that Hunter drove a gray Jeep Cherokee. He noted that Hughes had left on foot and walked toward Pine Court Street. Hughes also clarified that Hunter was wearing a gray t-shirt and shorts. Hughes described the gun and indicated that he believed Hunter was inebriated.

Meanwhile, Deputy Jessie Smith responded to the dispatch call and drove around the neighborhood looking for anyone matching the suspect's description. He traveled to Pine Court and observed an unoccupied Jeep Cherokee. He confirmed that the car was registered to Hunter. He then proceeded to the Stephens address and spoke with Hankamp. Hankamp informed him that based on the information Hughes had provided, there was no felonious assault but there was a carrying a concealed weapon charge. Smith informed Hankamp that he had located the Jeep and would return to its location and wait to see if anyone returned to the vehicle.

Deputy Smith positioned his vehicle a block away so that he could watch the Jeep. Around 2:53 a.m., he saw the Jeep leave Pine Court and travel northeast on Stephens toward his patrol vehicle. Deputy Smith moved his vehicle so that it was directly behind the Jeep. He activated his patrol car's overhead lights. Hunter immediately pulled into the driveway of 8660 Hemlock Court, got out of his vehicle and started to walk toward the residence.

Deputy Smith noted that Hunter matched the description given by the caller. Deputy Smith suspected that Hunter was armed based on the call and the information given by Hankamp, so he produced his service weapon and ordered Hunter back to his car. Hunter ignored this directive and refused to return to his car. Hunter repeatedly asked Smith what the problem was. Smith told Hunter that the vehicle's owner was potentially involved in a felonious assault. Hunter identified himself as Kendall Davis and explained that he had just left his cousin, Kewai Hunter's, home on Pine Court to come to the Hemlock house to visit a resident there. Hunter attempted to provide identification to Smith. Deputy Smith noticed that Hunter appeared nervous.

Deputy Hankamp arrived and detained Hunter. While performing a pat down of Hunter, Deputy Hankamp felt what he believed to be an object consistent with packaged drugs in Hunter's front pocket. Hamkamp's belief was based on hundreds, if not thousands, of pat down searches performed during the course of his twenty-three years as a police officer. Hankamp reached into Hunter's pocket and retrieved what appeared to be crack cocaine in a bag. Hankamp then placed Hunter under arrest and handcuffed him. A further search of Hunter's clothes uncovered a large amount of cash totaling $3,700.00 in the cargo pockets of his shorts. Hunter was detained in Hankamp's car.

Because the officers did not recover the handgun that was the subject of the dispatch call, they believed the weapon could be located in Hunter's car. Additionally, based on the large amount of money and crack cocaine found on Hunter's person, both Smith and Hankamp suspected that Hunter was involved in narcotics trafficking and further evidence of such criminal activity could be located in the car as well. Their suspicions in this regard became heightened when Hunter denied he had keys to the car, which was unbelievable since Smith had witnessed Hunter driving the car. Moreover, the house at Hemlock remained dark throughout their encounter with Hunter, tending to contradict Hunter's claim that he was there to visit and get high.

The officers were able to find Hunter's keys, which he had dropped on the floor of the patrol car. It appeared to Smith that Hunter was in the process of attempting to kick his keys under the front seat of the cruiser. When the officers proceeded to open the Jeep's door, they heard Hunter yell an expletive. A search of the Jeep produced a loaded handgun, additional crack cocaine, prescription pills and a digital scale.

A sergeant with the sheriff's department arrived and he discussed with Smith and Hankamp whether the vehicle should be impounded. Given that there was no indication that Hunter was expected at the Hemlock residence, the officers decided

to impound the car. Hunter was taken to jail and booked as Kendall Davis, but was later determined to be the Defendant herein.

## III. LAW & ANALYSIS

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches and seizures "are per se unreasonable . . . subject only to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Here, the Court finds that the Government has met its burden demonstrating that the warrantless searches of Hunter and the Jeep, as well as the seizure of Hunter were lawful under the Fourth Amendment.

### A. Reasonable Suspicion to Detain and Conduct Pat Down Search

Contrary to Defendant's arguments, Smith had reasonable suspicion that Hunter was engaged in criminal activity and could stop his vehicle and investigate. A police officer may stop a motorist when he possesses probable cause of a civil infraction or has reasonable suspicion of criminal activity. *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). "Reasonable suspicion" is a "particularized and objective basis for suspecting wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

Hunter fit the description that Hughes gave to the police and was driving the car that Hughes identified as his usual mode of transportation. Deputy Smith also

confirmed that the Jeep was registered to Hunter, the name that Hughes had given to the police. When Deputy Smith directed Hunter to return to his car, Hunter acted nervous and refused to comply with Smith's command. *United States v. Atchley*, 474 F.3d 840, 848-49 (6th Cir. 2007) (reasonable suspicion from anonymous tip plus nervous behavior when confronted by police); *United States v. Caruthers*, 458 F.3d 459, 465-68 (6th Cir. 2006) (anonymous call describing man's appearance did not provide reasonable suspicion by itself, but when combined with the man's attempts to conceal himself upon encountering the officers left "no doubt" there was reasonable suspicion to detain).

While Defendant makes much of the fact that Hankamp did not believe a felonious assault had occurred, this argument ignores that Hughes indicated Hunter was carrying a concealed weapon and was a felon. When Smith stopped Hunter's vehicle, he knew that the vehicle was registered to the very person who was suspected of carrying a concealed handgun without a permit. It is of no consequence that the initial dispatch call suggested a felonious assault. The officers had enough information to formulate reasonable suspicion that the driver matched the description given by Hughes and was likely armed despite his felon status and without a concealed weapons permit.

Additionally, the officers were permitted to pat down Hunter based on Hughes call about Hunter threatening him with a firearm and Hunter's conduct.

An officer may pat down a car's driver "upon reasonable suspicion that he may be armed and dangerous." *Knowles v. Iowa*, 525 U.S. 113, 118 (1998); *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *Pennsylvannia v. Mimms*, 434 U.S. 106, 111-12 (1977)(concluding that police may conduct a pat down once a motorist has been detained when they reasonably conclude the individual may be "armed and presently dangerous."). A pat down search must be limited in scope for ensuring officer safety, thus it "must be confined in scope to an intrusion reasonably designed to discover guns . . . or other hidden instruments for the assault of the police officer." *United States v. Wilson*, 506 F.3d 488, 492 (6th Cir. 2007).

Under the plain feel doctrine, an officer may seize an "object whose contour or mass" makes its identity as contraband "immediately apparent." *Minnesota v. Dickerson*, 508 U.S. 366, 375-76 (1993). Even though the pat down is for officer safety, "an officer does not need to ignore contraband should any be discovered." *United States v. Pacheco*, 841 F.3d 384, 395 (6th Cir. 2016).

Here, Deputy Hankamp immediately recognized the object in Hunter's pocket as consistent with crack cocaine based on his twenty three years of experience including hundreds, if not thousands of pat down searches where he recovered narcotics. *See United States v. Walker*, 181 F.3d 774, 778 (6th Cir. 1999) (concluding that officers "may seize nonthreatening contraband detected during a protective pat down search . . . so long as the officer['s] search stays

within the bounds marked by *Terry*."); *see also Pacheco*, 841 F.3d at 396 (upholding admission of cocaine bricks seized during valid *Terry* search because the seizure was based on the officer's training and experience regarding packaging, size, and feel of the object.)

Defendant maintains that Hankamp was too quick with his search and attempts to undermine Hankamp's testimony that he felt something in Hunter's pocket that was consistent with crack cocaine. However, the Court viewed the video of the pat down and it is evident that Hankamp felt the mass in Hunter's pocket while patting him down and then placed his hand in Hunter's pocket to retrieve the crack cocaine contained in a bag. Contrary to Defendant's argument, Hankamp did not exceed the permissible scope of a *Terry* pat down search and he therefore lawfully seized the crack cocaine based on his recognition. *Walker*, 181 F.3d at 778-79; *Pacheco*, 841 F.3d at 396.

**B.      Search of the Jeep**

As to the search of Hunter's Jeep, the Court finds that it was permissible under the automobile exception to the warrant requirement. Alternatively, the items would inevitably have been discovered once the Officers determined that the Jeep was subject to impound since it had no apparent reason to be parked at the private residence on Hemlock.

The automobile exception permits a warrantless search of an automobile if the search is conducted pursuant to probable cause. *Maryland v. Dyson*, 527 U.S. 465, 466-68 (2013). The police must have probable cause to believe contraband or evidence is located in the car. *California v. Acevedo*, 500 U.S. 565, 580 (1991).

Smith and Hankamp had probable cause to believe contraband was in the Jeep. Hughes had made a call to police concerning a felonious assault and provided details of the assailant, who was someone he knew, including his race and clothing. He told them Hunter had threatened him with a firearm by revealing its presence in the waistband of his shorts. He further described the type of vehicle he drove and where he usually parked. When Smith located the subject vehicle, he confirmed that it was registered in Defendant's name.

Additionally, as soon as Hunter realized he was being followed by Smith, he quickly parked in a driveway and exited his vehicle. The absence of lights inside the home suggested the residents were not expecting a visitor as Hunter claimed. Additionally, Hunter refused to abide by Smith's commands to return to his vehicle and acted evasively. During Hankamp's valid pat down search of Hunter, he recovered cocaine base and a large amount of cash. However, he did not find the firearm mentioned by Hughes. Once Hunter was detained, he denied he had keys on his person even though he was observed driving the vehicle and tried to conceal the keys by dropping them on the floor and kicking them under the seat. Based on

all of these facts, the officers had probable cause to believe the Jeep contained not only the handgun, but also evidence of narcotics trafficking.

In any event, even if the automobile exception did not apply, the contraband recovered from the Jeep would have been inevitably discovered pursuant to a valid inventory search. A pre-forfeiture inventory search of a vehicle does not require a warrant. *Florida v. White*, 526 U.S. 559, 561 (1999); *United States v. Decker*, 19 F.3d 287, 290 (6th Cir. 1994) ("'[W]here police have probable cause to believe a car is subject to forfeiture, or have validly seized a car for forfeiture, the polic[e] may search the car without a warrant.'") (quoting *United States v. Pace*, 898 F.2d 1218, 1245 (7th Cir. 1990)).

The officers determined the Jeep had no lawful reason to be parked in the driveway of the Hemlock residence and was subject to impound for this reason alone. However, the police had probable cause to believe the car was subject to forfeiture for the separate reason that it was being used for the transportation of narcotics. *See* 21 U.S.C. § 881(a)(4) ("All conveyances, including . . . vehicles . . . which are used . . . to transport, or in any manner facilitate the transportation, sale, receipt, possession, or concealment of controlled substances . . . are subject to forfeiture."); *see also United States v. Decker*, 19 F.3d 287, 290 (6th Cir. 1994) ("[W]here police have probable cause to believe a car is subject to forfeiture, or

have validly seized a car for forfeiture, the polic[e] may search the car without a warrant.")(internal quotation marks omitted).

## IV.    CONCLUSION

Accordingly, for the reasons articulated above, the Defendant's Motion to Suppress Evidence [#27] is DENIED.

SO ORDERED.

Dated:  October 23, 2018                                    /s/Gershwin A. Drain
                                                            GERSHWIN A. DRAIN
                                                            United States District Judge


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
October 23, 2018, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager